Ira Roth, Appellant, *v*. The Buffalo and State Line Railroad Company, Respondent.

Common carriers of passengers, with their ordinary baggage, for hire, are liable for losses occurring from any accident to the baggage while it is in their keeping as carriers, except those arising from the act of God or the king's enemies.

This strict accountability as carriers terminates within a reasonable time after the arrival of the baggage at the place of destination, where the carrier is ready to deliver the same to the passenger, according to the terms of the contract.

Where the passenger did not call for his trunk, but left it in the hands of the company overnight, without any arrangement with them, and the same was destroyed by the burning of the depot before morning, *held*, that the company were not liable.

Appeal from a judgment of the Superior Court of the city of Buffalo, affirming a judgment of the county court of Erie, reversing a judgment of a justice's court in favor of the plaintiff. The action was brought to recover the value of a trunk and its contents, the property of Vincent Dunn, the plaintiff's assignor, which, it was alleged, was delivered to the defendants, to be carried by them, with its owner, over their railroad from Dunkirk to Buffalo, for hire, and which they refused to deliver or account for to Dunn or the plaintiff. The cause was tried by the justice, without a jury. The following facts were shown by uncontradicted testimony: On the 13th of February, 1856, at Dunkirk, Dunn bought tickets and took passage for himself and wife in the defendants' cars to Buffalo. He had a trunk, which he delivered to the defendants' agents at Dunkirk, and procured to be checked by them for Buffalo, and they put it on board a baggage car at Dunkirk, which, as the evidence tends strongly to show, without dispute, was taken to Buffalo in the same train with the passenger car in which Dunn and his wife were seated. The train was delayed by deep snow, and reached Buffalo about ten o'clock at night. The weather was cold, and, as soon as the cars stopped, Dunn, with his wife, got out and left the depot without looking for his trunk or asking for it, but retaining the check, and he walked to the house of a

friend in the city, where he remained till the next morning. During the night, between eleven and one o'clock, the defendants' station house accidentally took fire and was consumed, with a considerable amount of baggage therein.  At daylight the next morning Dunn went to the station house and asked for his trunk, but search being made, it could not be found. Two witnesses, on the part of the defendants, testified that it is the uniform custom to deliver baggage to passengers on arrival of cars at the platform, on checks being presented ; and one of said witnesses testified that he was the train baggage-master from Dunkirk to Buffalo that night; that it was his business to unload baggage and deliver it, assisting the station men ; that he did so that evening, and delivered the baggage to all persons who called for it having checks. This testimony was not contradicted.

It appeared that the station house was occupied by the New York Central Railroad Company, as well as the defendants ; that a train arrived on that road soon after the arrival of the defendants' train ; that the trains had been irregular for several days, and a large amount of baggage had accumulated ; that baggage not claimed was put in the baggage room, for which the defendants charged no extra compensation ; that there was ample room for baggage when the trains were regular, but that, on the night in question, there was more unclaimed baggage than the baggage room could hold, and the surplus was piled outside of the room, near the door.

One witness, called by the defendants, testified that he was a policeman in their employ, and his business was to take care of the baggage and keep off passengers ; that, when the train in question came in and he had tied his ropes, he got upon the pile of baggage and told the people, in a loud voice, that could be heard throughout the depot, that the company could not keep the baggage, and would not be responsible, and they must take it.   Mrs. Dunn testified that she did not hear any notice to that effect.

Dunn and his wife testified that they went out of the depot on Michigan street, where a number of others went out, and they saw no carriages at that end of the station house, and

no one to carry the trunk. On the part of the defendants, it was testified that there were upward of twenty carriages on Exchange street when the train came in, and that carriages did not usually stand on Michigan street.

Dunn testified that the reason why he did not take the trunk was, that it was on his route the next morning. What his route was he did not state explicitly, but he testified that, after searching for his trunk the next morning, he left the check with his brother in Buffalo and went to Ohio.

The justice rendered a judgment for the plaintiff for $47.50 damages, with costs. The case is submitted on printed briefs.

*James A. Allen,* for the appellant.

*Sprague & Fillmore,* for the respondent.

SMITH, J. All extraneous circumstances stated by the witnesses being rejected, the case proved is briefly this: Dunn, the plaintiff's assignor, took passage, with his trunk, at Dunkirk, for Buffalo, on the defendants' cars. Immediately on the arrival of the cars at the place of destination, he went from the depot without looking for his trunk, or saying anything about it to defendants' agents, and left it in their hands, as he himself testified, solely for his own accommodation. The agents of the company immediately proceeded to unload the baggage on the train, and without any unnecessary delay were ready to deliver it, and did deliver all that was called for at the platform by persons having checks. They carefully stored what remained, and during the night the depot and portions of the baggage were consumed by fire, without fault on the part of the defendants, and doubtless Dunn's trunk was among the baggage thus destroyed.

The irregularity of the trains and the consequent accumulation of baggage at the Buffalo station, the lateness of the hour and the state of the weather, the fact that Dunn's wife was under his charge, and that he saw no carriage at the door from which he made his exit, are circumstances of no moment, since it is not shown that they rendered it unsafe

or improper for him to receive his trunk on its arrival, and besides it distinctly appears that they did not influence his conduct. According to his own statement, he left his trunk at the depot over night because " it was on his route the next morning."

What his route on the next morning was, does not appear, and it is not important, for the fact is undisputed that he had reached the termination of his route on the road of the defendants, and their ·contract to transport him and his baggage was fully performed.

It is well settled in this State, that common carriers of passengers, with their ordinary baggage, for hire, are liable for losses occurring from any accident to the baggage while it is in their keeping as carriers, except. those arising from the act of God or a public enemy. (*Hollister* v. *Nowlen*, 19 Wend., 234; *Cole* v. *Goodwin*, id., 251; *Powell* v. *Myers*, 26 id., 591.) This liability, once commenced, does not necessarily terminate with the transit, but *prima facie* continues until safe delivery of the baggage to its owner. (Id.) The case of *Powell* v. *Myers*, above cited, decided by the Court for the Correction of Errors, shows the extent to which these salutary rules have been enforced. There, a passenger on a steamboat on the Hudson river, from West Point to New York, left the boat on its arrival at New York, at about ten o'clock at night, its usual hour, leaving his trunk on board with the consent of the captain, and upon his assurance that it would be safe during the night. The next morning about eight o'clock the owner inquired for his trunk, and learned that it had been delivered to a negro on a forged order, the master of the boat pointing it out to him. The carrier was held liable.

But in that case Senator VERPLANCK remarked: "There may unquestionably be cases where, at some time after the arrival at the place of destination, the strict responsibility of the carrier, as such, for goods or baggage remaining in his possession undelivered, without fault or neglect of his own, should cease, and he would then continue to hold them, not as a carrier, insuring against all except public and inevitable

perils, but as a mere bailee in deposit, gratuitously or otherwise, according to circumstances. Such a termination of the carrier's responsibility and change of character of the deposit would be regulated by usage, the course of business, sometimes by legal principles applied to the special facts, the acts of parties and the common understanding of the transaction." The same learned jurist also suggested that the general rule governing such cases has not yet been distinctly and comprehensively laid down, either in the decisions or the text books, although the principle is to be found there.

The present case lacks the circumstances which controlled the decision in *Powell* v. *Myers*, to wit, the consent of the carrier that the trunk should remain in his possession, and his delivery of it on a forged order.

We are, therefore, to see whether there is any usage or legal rule applicable to the particular circumstances of this case, which terminated the strict responsibility of the defendants as carriers, according to the principle suggested in *Powell* v. *Myers.*

The usage relied upon by the defendants in respect to the delivery of baggage on the arrival of the cars was testified to by two persons only, and they were employés of the company. They did not state how long the usage had existed, or to what extent it was recognized by passengers; nor was any testimony given tending to show knowledge of it on the part of Dunn. It is true one of the witnesses stated that the usage was "uniform," and the other that it was "universal," but the fact that large amounts of baggage were lying in defendants' depot on the night in question, unclaimed by their owners, proved conclusively that the usage was neither universal nor uniform on the part of passengers. I think, therefore, it cannot be held that the responsibility of the carrier was at an end on the ground of usage or of a known course of business, as was the case in *Garside* v. *The Proprietor of the Trent and Mersey Navigation Co.* (4 Term, 581).

There are, however, certain legal principles applicable to the special facts of the case, which, it seems to me, obviously

determine it in favor of the defendants. It must be conceded that in a case like the one before us, the owner ought not to be permitted to prolong the strict and rigorous liability of the carrier by refusing or neglecting to receive his baggage for an unreasonable length of time after the transit is ended. The obligations of both parties are to some extent reciprocal. The carrier is bound to deliver safely to each passenger his baggage, at the place of its destination, in a reasonable time and manner; and when it is thus delivered or offered to be delivered, the passenger is bound to receive it and remove it in a reasonable time. If he refuses or neglects to do so, and the carrier thereafter retains it unclaimed by the owner, his liability is changed from that of an insurer to the responsibility of an ordinary bailee, liable only for losses occasioned by his own fault.

It is claimed, however, by the plaintiff, that the question of reasonable time is one of fact, and that the judgment of the justice is conclusive upon it. Ordinarily, it is a mixed question of fact and law. When the testimony is conflicting and the facts are unsettled, the jury are to decide, under the instructions of the court, as to the law. When there is no dispute as to the facts, the question is purely one of law, and the court should decide it. (11 Johns., 187; 3 Comst., 272; 3 Seld., 266; 27 Barb., 221; 2 Duer, 259; 1 Wend., 457.) In this case, as has been already said, it was proved without contradiction that the carrier transported the passenger and his trunk to the place of destination, and was ready to deliver it on its arrival, but the passenger, who accompanied it and therefore had notice of its arrival, neglected to receive it, and left it in the carrier's possession—not because it was unsafe or improper for him to take it, but because he preferred to leave it at the depot over night rather than carry it to his lodgings. His conduct was unreasonable, and the justice should have so held as matter of law upon the undisputed facts. By his neglect to remove the trunk, the subsequent liability of the defendants became that of an ordinary bailee, and they are not responsible for its loss, occasioned by an

accidental fire, which did not occur from any negligence or fault on their part.

The rules above stated in respect to the obligations of passengers are laid down strictly in view of the special facts of this case. They are not intended to apply to the case of merchandise transported as freight, unaccompanied by its owner, nor to the case of the baggage of a passenger, who, with the knowledge and consent of the agents of the railroad company, stops at an intermediate station on the route, over which he has contracted to be carried, intending to pursue his journey on a subsequent train, and leaving his baggage in the keeping of the carrier in the meantime.

The judgment of the Superior Court should be affirmed.

Judgment affirmed.